

FILED

Dec 11 2017, 9:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rory Gallagher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Supervising Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Richard Bernard Sansbury,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 11, 2017

Court of Appeals Case No.
49A05-1704-CR-793

Appeal from the Marion Superior Court.
The Honorable Steven J. Rubick, Magistrate.
Trial Court Cause No.
49G10-1601-CM-2065

**Barteau, Senior Judge**

# Statement of the Case

Richard Bernard Sansbury appeals his convictions of carrying a handgun without a license, a Class A misdemeanor,[1] and driving with a suspended license with a similar infraction within the past ten years, a Class A misdemeanor.[2] We reverse and remand.

# Issues

Sansbury raises three issues, which we consolidate and restate as:

I.    Whether the court erred in admitting evidence obtained during a search of the vehicle Sansbury was driving.

II.   Whether there is sufficient evidence to sustain Sansbury's conviction for driving with a suspended license with a similar infraction within the past ten years.

# Facts and Procedural History

On the evening of January 17, 2016, Detective Andrew McKalips and Officer Mollie Johanningsmeier of the Indianapolis Metropolitan Police Department (IMPD) were on patrol in Indianapolis. Detective McKalips was training Officer Johanningsmeier, who was a rookie. McKalips saw a vehicle, specifically a Pontiac Aztek, make a turn without activating a turn signal. He also noted that one of the Aztek's headlights was not working.

---

[1] Ind. Code § 35-47-2-1 (2014).

[2] Ind. Code § 9-24-19-2 (2012).

[4] McKalips turned his car around and stopped the Aztek in an apartment complex. The Aztek stopped near an apartment building, one and a half to two feet from the curb. The vehicle did not stop in a marked parking spot, but was instead sitting by the side of a road where traffic drove through the complex. McKalips approached the Aztek and learned that Sansbury was the driver. Sansbury had a passenger, Elisha Goins. Sansbury lived in the nearby building.

[5] McKalips determined Sansbury did not have a valid driver's license. Further, Sansbury was not the Aztek's registered owner. The registered owner was Sansbury's mother, Jorja Payton. McKalips decided to impound the Aztek. He contacted a tow truck and requested backup.

[6] Next, McKalips searched the vehicle, claiming it was necessary to inventory its contents. During the search he found three handguns. Two were in the center console, which was closed but not locked. McKalips found the third handgun under a back seat, concealed under a shirt. He also saw a clip of ammunition wedged between the driver's seat and the center console. McKalips determined that neither Sansbury nor Goins had a valid permit to possess guns. At that point, the search ended, and neither McKalips nor Johanningsmeier prepared a written inventory of the Aztek's contents.

[7] The State charged Sansbury with possession of a handgun without a license and driving with a suspended license with a similar infraction within the past ten years. Sansbury filed a motion to suppress all evidence discovered through the

search and seizure of the automobile.  The trial court held an evidentiary hearing and denied the motion at the end of the hearing.

[8]     The case was tried to the bench, and Sansbury renewed his objection to the admission of evidence discovered during McKalips' search.  The trial court overruled his objection.  After the State ended its presentation of evidence, Sansbury moved for involuntary dismissal.  The court adjourned the hearing to consider cases cited by Sansbury.  At a subsequent hearing, the court denied Sansbury's motion and offered Sansbury the opportunity to present evidence.  Sansbury chose not to present any evidence.  The trial court determined Sansbury was guilty as charged and imposed a sentence.  This appeal followed.

# Discussion and Decision

## I. Evidentiary Issue

[9]     As a preliminary matter, we note that the parties' briefs contain references to evidence presented during the suppression hearing.  The consideration of evidence presented at a previous proceeding in the same action is sometimes permitted.  *L.H. v. State*, 878 N.E.2d 425, 429 (Ind. Ct. App. 2007).  For example, incorporation of testimony from one proceeding into another may be appropriate when agreed to by the parties or when authorized by statute.  *Id.*

[10]    In the current case, prior to trial, neither party asked the court to incorporate the evidence that was presented during the suppression hearing into the evidence presented at trial.  Sansbury merely stated during trial that he was incorporating his arguments from the suppression hearing in support of his

objections and motion for involuntary dismissal. Further, there is no indication that the court relied on evidence presented at the suppression hearing during trial. We thus limit our evidentiary review to the testimony and exhibits presented during trial.

## II. Constitutional Claims - Impoundment and Search of the Vehicle

[11] Sansbury claims the handguns and ammunition should not have been admitted into evidence because the officers' impoundment of his mother's Aztek and subsequent search violated his federal and constitutional protections against unreasonable search and seizure. The State responds that the impoundment and inventory search were proper and did not violate Sansbury's constitutional rights. We resolve this issue under the Fourth Amendment and need not address Sansbury's claim under the Indiana Constitution.

[12] We review de novo a trial court's ruling on the constitutionality of a search or seizure, but we give deference to a trial court's determination of the facts. *Belvedere v. State*, 889 N.E.2d 286, 287 (Ind. 2008). We do not reweigh the evidence, but consider conflicting evidence most favorable to the trial court's ruling. *Id.* at 288.

[13] The Fourth Amendment provides in relevant part, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The amendment, as applied to the states through the Fourteenth Amendment, requires a warrant for a search to be

considered reasonable unless an exception to the warrant requirement applies. *Berry v. State*, 704 N.E.2d 462, 465 (Ind. 1998). When a search is conducted without a warrant, the State has the burden of proving that the search falls into one of the exceptions to the warrant requirement. *Meister v. State*, 933 N.E.2d 875, 878 (Ind. 2010).

[14] One exception to the warrant requirement is a police inventory search of a vehicle following impoundment. *Fair v. State*, 627 N.E.2d 427, 430 (Ind. 1993). Impoundment is proper when it is part of law enforcement's community caretaking function or is otherwise authorized by statute. *Id.* at 432. In this case, the State does not allege that the impoundment of the Aztek was justified by statute, and we must determine whether the seizure was permissible under law enforcement's community caretaking function.

[15] When impoundment is not specifically directed by statute, the risk increases that a decision to tow will be motivated solely by the desire to conduct an investigatory search. *Id*. at 433. To prevail on the question of whether an impoundment was warranted under the community caretaking function, the State must demonstrate that: (1) the belief that the vehicle posed some threat or harm to the community or was itself imperiled was consistent with objective standards of sound policing; and (2) the decision to combat that threat by impoundment was in keeping with established departmental routine or regulation. *Id.*

[16] In the current case, the IMPD's policy on impounding vehicles and conducting inventory searches was admitted into evidence at trial. Detective McKalips explained that he impounded the vehicle pursuant to the department's policy, specifically a provision that a vehicle may be impounded and towed if it is "operated by a non-licensed or suspended driver." Tr. Vol. III, State's Trial Ex. 2, p. 2. He also noted the car was "not in a parking spot." Tr. Vol. II, p. 70. The record reflects that Sansbury parked the car near an apartment building, one and a half to two feet from the curb, in an area where traffic drove through the complex. Tr. Vol. III, State's Trial Ex. 1. The IMPD's policy authorizes the towing of a vehicle that is causing "a traffic or other hazard." Tr. Vol. III, State's Trial Ex. 2, p. 2. Based upon these two reasons, we conclude the State established, for purposes of the Fourth Amendment, that the vehicle posed a threat of harm or was itself imperiled, and the decision to impound the car complied with established department regulations. *See Ratliff v. State*, 770 N.E.2d 807, 810 (Ind. 2002) (decision to impound truck did not violate Fourth Amendment; truck was stopped in the middle of a parking lot, not in a space).

[17] Sansbury cites to *Taylor v. State*, 842 N.E.2d 327 (Ind. 2006), in support of his claim that the decision to impound was improper, but that case is factually distinguishable. In that case, the Court concluded the car posed no hazard to public safety because it was parked "on the correct side of the parking lot," in "a permissible parking area." *Id.* at 332. In Sansbury's case, the car was not

parked in a parking area, but rather was stopped in a road where traffic drove through the complex.

[18] Sansbury also cites to *Fair*, 627 N.E.2d 427, but that case is distinguishable as to the issue of impoundment. In that case, the Indiana Supreme Court determined that the police erred in impounding the defendant's car because it was "neatly parked" in an apartment complex and "did not impede traffic." *Id.* at 433-34. By contrast, Sansbury's car was parked one and a half to two feet from the curb, in the flow of traffic.

[19] As further support for his challenge to the impoundment of his car, Sansbury points to testimony that: (1) the owner of the apartment complex permitted residents to park along the curb when the parking spots were full; and (2) Sansbury's roommate had called Sansbury's mother during the stop, and she appeared at the apartment complex during the stop and should have been allowed to move the car. This evidence was submitted at the suppression hearing, not at trial. Even if the evidence had been submitted at trial, it does not change the result. Regardless of where the owner of the complex permitted people to park under certain circumstances, the Aztek was still stopped in an area through which traffic drove. In addition, Detective McKalips had told Sansbury's roommate he would release the car to Sansbury's mother if she arrived before it was placed on the tow truck, but she did not meet that

deadline. We agree with the trial court that the decision to impound the vehicle did not violate the Fourth Amendment.

[20] We reach a different conclusion as to the vehicle search that followed the decision to impound the Aztek. The State claims the search was a valid inventory search. To be reasonable under the Fourth Amendment, an inventory search must be conducted pursuant to standard police procedures. *Id.* at 435. The rationale for the inventory exception is threefold: (1) protection of private property in police custody; (2) protection of police against claims of lost or stolen property; and (3) protection of police from possible danger. *Gibson v. State*, 733 N.E.2d 945, 956 (Ind. Ct. App. 2000). An inventory search must not be a pretext for a general rummaging to discover incriminating evidence. *Fair*, 627 N.E.2d at 435 (quotation omitted).

[21] At the risk of stating the obvious, courts should keep in mind that such a search must be "designed to produce an inventory of the vehicle's contents." *Id.* at 430. If an officer conducts an inventory search in compliance with valid protocol, the search may be constitutionally valid despite minor deviations from the policy. *Sams v. State*, 71 N.E.3d 372, 377-78 (Ind. Ct. App. 2017). Major deviations from an inventory search policy may give rise to an inference of pretext which the State must overcome. *Id.* at 378.

[22]     In this case, the IMPD's policy for impounding vehicles defines an inventory search as "conducting an administrative, routine and warrantless search of the passenger area (including the glove compartment), trunk, and closed containers, pursuant to lawfully towing a vehicle." Tr. Vol. III, State's Trial Ex. 2, p. 2. The policy further provides, in relevant part:

> IV.  Inventory Searches
>
> NOTE:  An inventory search should not be motivated by an officer's desire to investigate and seize evidence of a criminal act.
>
> A.  Whenever an officer takes a vehicle into custody, an inventory search will be conducted prior to impoundment and a detailed listing of *any property* found in the vehicle *will* be made.
>
> 1.  The vehicle inventory search will consist of searching the passenger compartment of the vehicle.
>
> 2.  If a key is available, or if unlocked, the glove compartment and trunk will also be searched.
>
> NOTE:  Under NO circumstances should force be used to open either the glove compartment or trunk for an inventory search.
>
> 3.  All containers in the vehicle must be searched.  Locked containers should not be forced open.
>
> * * * *
>
> B.  *All property* discovered during an inventory search, including those found in closed containers, *will* be listed in the officer's personal notebook.

*Id.* at 5-6 (emphasis added).

[23]     In this case, the officers' conduct deviated greatly from the requirements of the policy.  Although Detective McKalips conceded the policy required an inventory "to insure [sic] that the valuables are accounted for," Tr. Vol. II, p.

64, neither he nor Officer Johanningsmeier created a list of property found during the search of the Aztek. Officer Johanningsmeier filled out a tow slip for the tow truck, but she did not include a description of the vehicle's contents, even though she testified it was her understanding that all property of value should be listed on the tow slip. The officers' failure to produce a written inventory disserved two of the purposes of inventory searches: protection of private property in police custody and protection of police against claims of lost or stolen property.

[24] Further, Detective McKalips' focus on valuable items does not comport with the policy, which requires an inventory of all property found in the vehicle, not just items that the officer subjectively perceives to be valuable. The focus on "valuable" items undermines confidence in the validity of the inventory search. *See Sams*, 71 N.E.3d at 381 (finding inventory search invalid where the officer searched only for valuable items, but the official policy required an inventory of all items found in the vehicle).

[25] Officer Johanningsmeier attempted to explain these deviations from the official policy by stating that after Detective McKalips found the guns, his efforts "turned into a search of the vehicle for evidence. It wasn't an inventory search any more." Tr. Vol. II, p. 101. An officer's focus on contraband to the exclusion of personal items is an additional indication of pretext. *See Fair*, 627 N.E.2d at 436 (inventory search deemed unreasonable where officer focused on

marijuana and a sawed-off shotgun). Officer Johanningmeier's testimony, combined with the officers' misinterpretation of the policy and their failure to generate a written inventory of all items found in the car, leads us to conclude that the inventory search was in essence a general investigatory search for contraband, and therefore unreasonable under the Fourth Amendment. *See Sams*, 71 N.E.3d at 382-83 (officers' failure to comply with official policy governing inventory searches rendered search unreasonable).

[26] The State argues that this Court has on several occasions determined that failure to produce a written inventory does not render an inventory search unreasonable, but the cases the State cites are distinguishable. In *Weathers v. State*, 61 N.E.3d 279 (Ind. Ct. App. 2015), a panel of this Court upheld a conviction for possession of a handgun without a license, determining an inventory search was valid even though the officer failed to write an inventory of the vehicle's contents. The Court noted the defendant had told the officer prior to the search that there was a handgun in the car, and during the search the officer found the gun in the exact location the defendant had described. Under the circumstances of that case, the Court determined the lack of a written inventory was not dispositive. *Id.* at 289.

[27] By contrast, in the current case neither McKalips nor Johanningsmeier asked Sansbury or his passenger about handguns or contraband in the Aztek prior to the search, and after the search Sansbury and the passenger professed not to

know that the guns and ammunition were in the car. These facts are sufficient to distinguish *Weathers* from the current case.

[28] In *Whitley v. State*, 47 N.E.3d 640 (Ind. Ct. App. 2015), *trans. denied*, a panel of this Court determined that the failure to fill out an inventory of the vehicle's items did not render the search unreasonable because, among other grounds, a technician took photographs of the vehicle's interior, which provided a record of its contents in a different format. In the current case, there are no documents that provide a record of the Aztek's contents other than the probable cause affidavit, and that document focuses on the contraband.

[29] Finally, in *Jackson v. State*, 890 N.E.2d 11 (Ind. Ct. App. 2008), a panel of this Court determined that an inventory search was reasonable even though the arresting officer did not fill out an inventory report, because another officer on the scene filled out the report. In Sansbury's case, none of the officers filled out such a report.

[30] The State further claims that the search was a valid inventory search because the officers described some of the items in the probable cause affidavit and because an officer photographed the vehicle prior to it being towed. These claims are without merit because: (1) as noted above, the affidavit discussed only the guns and ammunition, plus a shirt under which one of the guns had been hidden; and (2) the photographs were not admitted into evidence, and we

may not speculate as to whether they are an adequate substitute for a written inventory. Having concluded that the search violated the Fourth Amendment, we must further conclude the trial court erred in admitting as evidence the handguns discovered during the search. We reverse Sansbury's conviction for possession of a handgun without a license.

## III. Sufficiency of the Evidence – Driving While Suspended

[31] Sansbury argues the State failed to prove he committed the offense of driving with a suspended license with a similar infraction within the previous ten years. The State does not dispute that Sansbury did not commit a similar infraction within the previous ten years but claims he is still guilty of an infraction of driving with a suspended license.

[32] In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *Jennings v. State*, 982 N.E.2d 1003, 1005 (Ind. 2013). Rather, we look to the evidence and reasonable inferences that support the verdict and affirm the conviction if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[33] To establish a conviction for the offense, the State was required to prove beyond a reasonable doubt that: (1) Sansbury (2) operated a motor vehicle on a highway (3) knowing that his driving privileges, license, or permit had been suspended or revoked; and (4) had committed a similar violation less than ten years prior. Ind. Code § 9-24-19-2.

[34] In this case, Detective McKalips consulted his computer during the traffic stop on January 17, 2016. He determined at the time that Sansbury did not have a valid license, but by the time of the trial he did not "recall a specific denotation that [Sansbury] was not supposed to be driving a vehicle on that night." Tr. Vol. II, p. 62. Sansbury's official driving record was admitted into evidence at trial, but it fails to demonstrate that his license was suspended on January 17, 2016. Instead, it shows Sansbury's license was suspended from July 7, 2015 through October 5, 2015, with the period of suspension ending well before the night of the traffic stop.

[35] The State argues the suspension could have remained in effect as of January 17, 2016, if Sansbury had failed to provide proof of insurance to the Bureau of Motor Vehicles at the scheduled end of the suspension period. This argument invites us to speculate as to evidence not in the record. The State further argues that Sansbury bore the burden of proving by a preponderance of the evidence that he had a valid license at the time of the alleged offense. The State is correct. Ind. Code § 9-24-19-7 (2015). Nevertheless, the Bureau of Motor Vehicle's record for Sansbury, standing alone, demonstrates his suspension had come to an end by the time of the traffic stop, and there is no other evidence from which we may infer Sansbury's license was not reinstated following the end of the suspension. The State failed to carry its burden of proof as to whether Sansbury's license was suspended on the date in question, and we must reverse his conviction. *See Frink v. State*, 568 N.E.2d 535, 538 (Ind. 1991) (insufficient evidence to sustain conviction for driving with a suspended license

when defendant's record showed the period of suspension had elapsed by the time of the traffic stop).

## Conclusion

[36] For the reasons stated above, we reverse the judgment of the trial court and remand for further proceedings not inconsistent with this opinion.

[37] Reversed and remanded.

Baker, J., and Riley, J., concur.